**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| MICAH JACQUEMIN, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CITY OF WOODSON TERRACE, et al., )<br>)<br>Defendants. ) | No. 4:12-CV-418 CAS |

**MEMORANDUM AND ORDER**

Pending before the Court is defendants City of Woodson Terrace and Lawrence Besmer's motion for summary judgment on the merits of plaintiff's claims. Also pending before the Court is defendant Lawrence Besmer's second motion for summary judgment, based on the doctrine of legislative immunity, and defendant City of Woodson Terrace's second motion for partial summary judgment, based on the doctrine of sovereign immunity. Plaintiff opposes the motions, which are fully briefed and ripe for review. For the following reasons, the Court will grant defendant Lawrence Besmer's second motion for summary judgment, and defendant City of Woodson Terrace's second motion for partial summary judgment, and the Court will deny as moot, in part, and deny, in part, defendants' first motion for summary judgment.

*I. Background*

Plaintiff, a former employee of the City of Woodson Terrace (hereinafter "Woodson Terrace" or the "City"), filed the instant employment case against the City and Lawrence Besmer, the mayor of Woodson Terrace (the "Mayor"). In his Second Amended Complaint (hereinafter the "Complaint"), plaintiff alleges two counts of wrongful discharge in violation of public policy under Missouri state law. In Count I, against the City, plaintiff alleges that his longtime employment was

terminated because he reported criminal activity. In Count II, also against the City, he alleges his employment was unlawfully terminated because he campaigned against the Mayor. Plaintiff also brings a claim pursuant to 28 U.S.C. § 1983 against the City and the Mayor, in the Mayor's individual capacity. In Count III, plaintiff alleges that defendants violated his constitutional rights in that they terminated his employment for exercising his First Amendment right to political association.

Defendants move for summary judgment as to all of the claims in plaintiff's Complaint. In their first motion for summary judgment, defendants argue that the undisputed facts show that plaintiff cannot establish a prima facie case for any of the claims he alleges in his Complaint, and in any event, there was a legitimate reason for the termination of his employment. In the Mayor's second motion for summary judgment, he argues that he is entitled to legislative immunity as set forth in Leapheart v. Williamson, 705 F.3d 310 (8th Cir. 2013). The City argues in its second motion for partial summary judgment that it is entitled to sovereign immunity as to Counts I and II, and that plaintiff cannot recover punitive damages against the City.

## II. Summary Judgment Standard

The standard applicable to summary judgment motions is well-settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party. City of Mt. Pleasant, Ia. v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor).

Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence he or she must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1029 (8th Cir. 2000). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Herring, 207 F.3d at 1029 quoting Anderson, 477 U.S. at 248. A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact. See Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004). "Self-serving, conclusory statements without support are not sufficient to defeat summary judgment." Armour and Co., Inc. v. Inver Grove Heights, 2 F.3d 276, 279 (8th Cir. 1993).

In passing on a motion for summary judgment, it is not the court's role to decide the merits. The court should not weigh evidence or attempt to determine the truth of a matter. Rather, the court must simply determine whether a genuine issue of material fact exists. Bassett v. City of Minneapolis, 211 F.3d 1097, 1107 (8th Cir. 2000).

### III.  Facts

With the standard in mind, Court accepts the following facts as true for purposes of summary judgment:

Woodson Terrace is a duly authorized municpal corporation located in the County of St. Louis, Missouri.  Lawrence Bemser was at all relevant times the Mayor of Woodson Terrace. Plaintiff began his employment with Woodson Terrace as a mechanic in May 1996.  In April 2001, plaintiff was promoted to Superintendent of Public Works.  As Superintendent of Public Works, plaintiff was responsible for overseeing the parts department, the street department and building maintenance.  He supervised six to seven employees.

Sometime in October or November 2008, an employee, who plaintiff supervised, came to plaintiff and told him that he believed money was missing from the "kitty fund." The kitty fund, which was funded by selling scrap metal, was used by City employees for coffee, beer, parties and fish fry events.  In 2008, the kitty fund contained approximately $500.00, and was stored in a container in plaintiff's unlocked locker.  Plaintiff went to the City Police Department and reported that money was suspected missing from the kitty fund.  The police advised plaintiff that they would handle the matter.  Plaintiff did not perform his own investigation of the missing money.

The employee who spoke to plaintiff also reported the suspected theft to the Mayor.  Later that week, the Mayor approached plaintiff about the kitty fund.  The Mayor asked plaintiff why he had not approached him regarding the missing money, and he informed plaintiff that he would need to open an investigation.  Plaintiff did not state that he had initiated an investigation with the City Police Department.  Plaintiff testified that the Mayor was angry, and that he believed he was angry because he had not reported the incident to the Mayor right away.  Plaintiff was never implicated in

the missing money. The police report, which the Mayor received in April 2009, did state that plaintiff had said that he "prefer[ed] to keep the matter in house due to the fact he would take care of the matter and he did not wish to involve [the Mayor]." See Doc. 70, Ex. 2 at 1.

As a result of this incident, the Mayor shut down the kitty fund. The Mayor testified that he lost trust in plaintiff, and in June 2009, he demoted plaintiff to the position of Shop Foreman. The Shop Foreman position had not been filled for the previous three years. While he was Superintendent of Public Works, plaintiff never requested that the Shop Foreman be filled, and plaintiff testified that he felt he could discharge his duties as Superintendent without a Foreman. Following his demotion, Doug Zaiz became Superintendent of Public Works.

Sometime in December 2009, the Mayor filed to run for re-election. He had one opponent, Kathy Wheeling. Plaintiff supported Ms. Wheeling and actively campaigned on her behalf. Plaintiff placed yard signs, talked to residents, and participated in public demonstrations supporting Ms. Wheeling. It is disputed as to whether the Mayor was aware or had knowledge that plaintiff was campaigning on behalf of the Mayor's opponent.

The election was held on April 6, 2010, and the Mayor won re-election. On April 9, 2010, plaintiff received notice from the Mayor that the Shop Foreman's position was going to be eliminated by a vote of the Board of Aldermen due to economic reasons. On April 15, 2010, the Board of Aldermen passed an ordinance eliminating the position held by plaintiff, Shop Foreman, "for economic reasons." See Doc. 59, Ex. 6. The ordinance was signed by the Mayor. No other positions were eliminated. It is undisputed that eliminating the Foreman position did save the City money. However, at the time the City considered and took no other cost saving measures. There were other employees with less seniority than plaintiff whose positions were not eliminated, and no written

disciplinary actions were in plaintiff's personnel file. Sometime after plaintiff's position was eliminated, all City employees received raises.

In the Complaint, plaintiff alleges that in fall and early winter 2009, he reported to his supervisor, Doug Ziaz, the fact that gas heaters, light fixtures, ceiling tiles, copper wires, and doors were being unlawfully removed from City property.  He also alleges that in January 2010,  he reported to the Chief of Police for the City that the Mayor had appointed Donna Conlon an alderman for Ward I, although she lived in Ward II.

Plaintiff was questioned about these allegations in his deposition.

| | |
|---|---|
| Plaintiff: | I went and told Doug [Ziaz] the heaters weren't there for me to pick up, and he said okay. . . . |
| Attorney: | Did you report the gas heaters being missing as a crime to anyone else? |
| Plaintiff: | I told the PD about it. |
| Attorney: | And when did you do that? |
| Plaintiff: | I don't remember the dates. |
| Attorney: | Do you remember the month? |
| Plaintiff: | I do not. |
| Attorney: | Okay.  Why did you tell the police about the one missing gas heater? |
| Plaintiff: | Just general conversation, we're all friends. |
| Attorney: | Did you fill out a report, a crime report? |
| Plaintiff: | No. |
| Attorney: | Do you were just talking to friends of yours? |
| Plaintiff: | Yes. |

. . .

| | |
|---|---|
| Attorney: | Do you know whether or not Mayor Besmer was mad at you for telling your boss the heaters were missing? |
| Plaintiff: | No. |
| Attorney: | Do you know if anyone was mad at you for telling your boss the heaters were missing? |
| Plaintiff: | No. |
| Attorney: | Do you think the gas heaters being missing has anything to do with this lawsuit? |
| Plaintiff: | No. |
| Attorney: | Let's talk about the data cable then.  Tell me about that. |

| | |
|---|---|
| Plaintiff: | That – that I never seen removed from the building.  It was wound up like it has been ready to be taken.  That's all I know about the data cable. |
| Attorney: | Do you know whether it was missing or not? |
| Plaintiff: | I do not. |
| Attorney: | Do you think that has anything to do with this lawsuit? |
| Plaintiff: | No. |
| Attorney: | What about the doors or light bulbs or toilets? |
| Plaintiff: | No. |
| Attorney: | Any other missing items or stolen items that you reported that you think are related to this lawsuit? |
| Plaintiff: | No. |

Plaintiff's Deposition Trans. at 60 - 62.

| | |
|---|---|
| Attorney: | I understand that there was some issue in an election about a woman named Donna Conlon and where she lives.  Do you know anything about that? |
| Plaintiff: | Yes. |
| Attorney: | Tell me what you know about that. |
| Plaintiff: | She was appointed by the Mayor and it had came up was she living in Ward I or Ward II.  That it just – it came up she was living in the ward she wasn't appointed to. |
| Attorney: | Appointed as an alderman? |
| Plaintiff: | Yes, alderwoman. |
| Attorney: | Did you report her? |
| Plaintiff: | I did not report her. |
| Attorney: | Did you have anything to do with blowing the whistle on Donna Conlon living where she wasn't suppose to live? |
| Plaintiff: | Yes, I asked the chief of police if she indeed lived in the opposite ward, and he said he did not know. |
| Attorney: | Did you do anything else beyond that? |
| Plaintiff: | I told the – his running mate, Jimmy Carr, that she was living in the wrong ward she was appointed to. |
| Attorney: | Okay.  And who was it that you told that to? |
| Plaintiff: | Jimmy Carr. |
| Attorney: | And who is he? |
| Plaintiff: | He was running for alderman. |
| Attorney: | Against her? |
| Plaintiff: | Yes. |
| Attorney: | And what happened from that after you told him that? |
| Plaintiff: | I do not know. |
| Attorney: | Did you ever talk to the Mayor about that? |
| Plaintiff: | No. |
| Attorney: | Did you ever talk to the City attorney about that? |
| Plaintiff: | No. |

| | |
|---|---|
| Attorney: | Do you know whether that issue with Donna Conlin has anything to do with this lawsuit? |
| Plaintiff: | No. |
| Attorney: | It doesn't? |
| Plaintiff: | No. |
| Attorney: | When the mayor was running for reelection did you campaign for the opponent to the mayor? |
| Plaintiff: | I was for her. |
| Attorney: | And what was her name? |
| Plaintiff: | Kathy Wheeling. |
| Attorney: | . . . Do you think your campaign for Kathy Wheeling as anything to do with this lawsuit? |
| Plaintiff: | Yes. |
| Attorney: | Tell me what you think that is. |
| Plaintiff: | Because I wasn't for the mayor. |
| Attorney: | Tell me what you mean by that. |
| Plaintiff: | I didn't campaign for him. I didn't knock door to door. I didn't have his sign in my yard. And I didn't work the polls for him that day. |

Id. at 64-65.

The City participated in a program called Missouri Intergovernmental Risk Management Associations ("MIRMA"), which included coverage under a policy of self-insurance for the period from July 1, 2009 to June 30, 2010. The MIRMA policy included a specific provision regarding sovereign immunity, which stated:

> The coverage provided by this protected self insurance plan does not apply to any claim or "lawsuit" which is barred by the doctrines of sovereign immunity and/or official immunity although defense of such actions shall be provided. No provision of this condition of coverage, or the coverage outline in which it is included, shall constitute a waiver of MIRMA's right or the right of any protected self insured to assert a defense based on the doctrines of sovereign immunity or official immunity.

See Doc. 59, Ex. C.

### *IV. Immunity*

The Mayor filed a motion for summary judgment on the grounds that (1) he is entitled to legislative immunity for the claim asserted against him in his individual capacity; and (2) he is immune from punitive damages.[1] The City filed a motion for partial summary judgment in which it argues: (1) Count I and II are barred by the sovereign immunity doctrine, and (2) plaintiff is barred from recovering punitive damages against the City as a matter of law. Plaintiff opposes both of these motions, arguing neither defendant is entitled to any immunity.

### A.     **Legislative Immunity and Claims against the Mayor**

Citing to the very recent Eighth Circuit case, Leapheart v. Williamson, 705 F.3d 310 (8th Cir. 2013), the Mayor argues that he is entitled to legislative immunity as to all claims against him. According to the Eighth Circuit, "[a] local legislator is entitled to absolute legislative immunity for acts undertaken within the 'sphere of legitimate legislative activity.'" Leapheart, 705 F.3d at 313 (quoting Bogan v. Scott–Harris, 523 U.S. 44, 54 (1998)). When determining whether an act is legislative, courts are to apply "a functional test." Id. (citing Redwood Vill. P'ship v. Grahm, 26 F.3d 839, 840 (8th Cir. 1994)). "Legislation . . . looks to the future and changes existing conditions by making a new rule to be applied thereafter to all or some part of those subject to its power." Id. (citing to Prentis v. Atl. Coast Line Co., 211 U.S. 210, 226 (1908)). "For example, passing an ordinance is a legislative act." Id. (citing to Bogan, 523 U.S. at 55).

In Leapheart, an African-American prospective employee brought action against the former mayor and city council members of the city of Russellville, Arkansas, alleging violations of Title VII

---

[1] He also moves for summary judgment on the basis that he was not named in his official capacity. It is clear from the Second Amended Complaint, and plaintiff acknowledges, that the Mayor is only being sued in his individual capacity.

and the Age Discrimination in Employment Act. The plaintiff had applied for a position that the mayor had the final decision making authority on who to appoint.  After the mayor had hired the plaintiff for the position, the city counsel met and passed an ordinance eliminating the position and creating a new position in the same department, for which they had the sole and authority to hire and fire.  The city counsel voted to override the appointment of the plaintiff and posted the new position.  The plaintiff in Leapheart sued the mayor and the members of the city council in their individual capacities.

The city council members moved for summary judgment on the basis of legislative immunity.  In its decision, the Eighth Circuit noted that "the hiring and firing of specific individuals generally is not protected by legislative immunity because it is an administrative action."  Leapheart, 705 F.3d at 314.  However, "the wholesale elimination of a position" is protected by legislative immunity because "it may have prospective implication that reach well beyond the particular occupant of the office."  Id. (quoting Bogan, 523 U.S. at 56).  The Eighth Circuit held that the city council members were entitled to legislative immunity.

Based on the holding in Leapheart, the Court must find that the Mayor is entitled to legislative immunity here because the undisputed facts show that plaintiff's position was eliminated by an ordinance passed by the Board of Alderman.  Leapheart, 705 F.3d at 314. And although the Mayor is not a legislator but an executive, he signed the ordinance into law, which was a legislative act for which he is entitled to legislative immunity.  Bogan, 523 U.S. at 55 ("[the mayor]'s introduction of a budget and signing into law an ordinance also were formally legislative, even though he was an executive official. We have recognized that officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions").  The Court will dismiss the Mayor on the basis of legislative immunity.

**B.     Sovereign Immunity for the City.**

The City argues that it is entitled to sovereign immunity as to plaintiff's claims in Count I and II of the Complaint. Plaintiff argues in response that the City waived its sovereign immunity because it participated in the MIRMA insurance program.  The City replies that the policy in question does not waive its sovereign immunity because the policy contained a non-waiver provision.

In Missouri, the doctrine of sovereign immunity generally protects public entities from liability for negligent acts.  Mo. Rev. Stat. § 537.600; State ex rel. Cass Med. Ctr. v. Mason, 796 S.W .2d 621, 22 (Mo. 1990) (en banc).  Section 537.600.1 waives this immunity for injuries resulting from negligent acts or omissions by public employees operating motor vehicles, and for injuries resulting from the dangerous condition of a public entity's property.  Under Mo. Rev. Stat. § 537.610.1, when a public entity purchases liability insurance for tort claims, "sovereign immunity is waived to the extent of and for the specific purposes of the insurance purchased." State ex rel. Bd. of Trustees of City of N. Kansas City Mem'l. Hosp. v. Russell, 843 S.W.2d 353, 360 (Mo. 1992) (en banc).

The City is correct that it is entitled to sovereign immunity on plaintiff's state law claims. Plaintiff's claims against the City are based on the wrongful performance of a governmental function, and are claims to which the doctrine of sovereign immunity applies. The fact that plaintiff has alleged intentional torts does not change this analysis. Numerous decisions have held that intentional torts are included in the protection of sovereign immunity. See, e.g., Mitchell v. Village of Edmundson, 891 S.W.2d 848, 850 (Mo. Ct. App. 1995) (conversion claim; court stated, "Intentional torts have consistently been found to fall within the shield of sovereign immunity"); Duncan v. Creve Coeur Fire Protection Dist., 802 S.W.2d 205, 207 (Mo. Ct. App. 1991) (applying sovereign immunity to intentional infliction of emotional distress claim); Carmelo v. Miller, 569 S.W.2d 365, 367-68 (Mo.

Ct. App. 1978) (sovereign immunity applied to a claim for assault and battery and false imprisonment by police officer).

The Court also finds that none of the exceptions found in § 537.610.1 apply in this case. It is undisputed that the case does not involve a dangerous condition or the operation of a motor vehicle. As for the liability insurance exception, "where the insurance policy includes a disclaimer concerning the waiver of sovereign immunity, it has not been waived under § 537.610.1." Conway v. St. Louis County, 254 S.W.3d 159, 167 (Mo. Ct. App. 2008). Although the City does participate in a self-insurance program called the Missouri Intergovernmental Risk Management Association ("MIRMA"), it has not waived sovereign immunity. The City's policy provision specifically states that:

> The coverage provided by this protected self insurance plan does not apply to any claim or "lawsuit" which is barred by the doctrines of sovereign immunity and/or official immunity although defense of such actions shall be provided. No provision of this condition of coverage, or the coverage outline in which it is included, shall constitute a waiver of MIRMA's right or the right of any protected self insured to assert a defense based on the doctrines of sovereign immunity or official immunity.

See Doc. 59, Ex. C. Missouri courts frequently uphold similar non-waiver provisions in public entity insurance contracts, and in fact, they have upheld sovereign immunity under the same policy. See e.g., Russell, 843 S.W.2d at 360 (sovereign immunity provision does not constitute a waiver of immunity under § 537.610); Conway, 254 S.W.3d. at 167 (same). See also Wright v. City of Salisbury, 656 F. Supp. 2d 1013, 1030 (E.D. Mo. 2009). Therefore, the Court finds the City has not waived its sovereign immunity and it is entitled to summary judgment as to Counts I and II of the Complaint.[2]

---

[2]Even if the Court were to find the City had waived sovereign immunity, it would be entitled to summary judgment as to Count I. It is clear from plaintiff's deposition transcript that he has abandoned this claim. Plaintiff testified that his reports of the removal of City property and the fact that an alderwoman lived in the wrong ward has nothing to do with his lawsuit. In opposition to

### C.     *Punitive Damages Against the City.*

Finally, in its second motion for partial summary judgment, the City moves for summary judgment as to any claim of punitive damages against it.  Municipalities cannot be held liable for punitive damages under Missouri law or Section 1983.  See City of Newport v. Fact Concerns, Inc., 453 U.S. 247, 271 (1981) (punitive damages are not recoverable against a municipality under section 1983);  Mo. Rev. Stat. § 537.610 (no award for damages on any claim against a public entity within the scope of the sovereign immunity statute shall include punitive or exemplary damages).  In his response memorandum, plaintiff concedes he is not entitled to punitive damages against the City.  The Court will grant defendant Woodson Terrace summary judgment as to the issue of punitive damages.

### *V.  Remaining Claims*

Count III against the City is the only remaining claim not subject to sovereign or legislative immunity. In Count III of his Complaint, which plaintiff brings pursuant to 42 U.S.C. § 1983, plaintiff alleges that the City and Mayor retaliated against him for exercising his First Amendment

---

defendants' motion for summary judgment, plaintiff attempted rehabilitate his deposition testimony by filing an affidavit that contradicted his testimony.  Plaintiff, however, does not explain in his affidavit why he was confused during his deposition, or why he believed defense counsel's use of the term "lawsuit" only referred to his claim of retaliation for campaigning. Parties opposing summary judgment cannot create "sham" issues by submitting affidavits that contradict previous unambiguous deposition testimony."  RSBI Aerospace, Inc. v. Affiliated FM Ins. Co., 49 F.3d 399 (8th Cir. 1995). The Court carefully reviewed the deposition testimony.  Plaintiff was clearly asked whether his reports of stolen property and the fact that an alderwoman lived in a different ward had anything to do with this lawsuit.  The question unambiguously indicated that it was not directed at a particular claim, but rather it encompassed the suit as a whole.  Furthermore, the defense attorney did not use terms that might be confusing to a layperson. Plaintiff testified that he did not believe that his position was eliminated because of the reports he made, but rather he believed that his position was eliminated because he campaigned against the Mayor and on account of the kitty fund issue.  As plaintiff cannot create a factual issue by contradicting his previous sworn testimony, the City would be entitled to summary judgment as Count I, if it were not already protected by sovereign immunity.

13

rights of political association. Plaintiff claims that the City and Mayor took adverse employment actions against him, and that the "desire and intent to retaliate against [plaintiff] for supporting the Mayor's opponent was a substantial or motivating factor in the City's and the Mayor's actions against [plaintiff]." See Doc. 44 at 9. The City argues in its motion that the claim fails as a matter of law because plaintiff cannot establish a prima facie case of retaliation, but even if he could, the evidence establishes that the City would have taken the same action in any event.

To establish a prima facie case of retaliatory termination under § 1983, a plaintiff must prove that (1) his or her speech was protected by the First Amendment; (2) the governmental employer discharged plaintiff from employment; and (3) the protected speech was a "substantial or motivating" factor in the defendants' decision to discharge the plaintiff. Rynders v. Williams, 650 F.3d 1188, 1194 (8th Cir. 2011). See also Davison v. City of Minneapolis, 490 F.3d 648, 654-55 (8th Cir. 2007). Only if the plaintiff establishes a prima facie case does the burden of production shift to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. Id.

The City argues plaintiff cannot establish a prima facie case because he cannot show that his campaigning against the Mayor was a "substantial or motivating" factor in the City's decision to discharge plaintiff. More specifically, it argues there is no admissible evidence that the Mayor knew plaintiff was campaigning against him. It also argues that even if the Mayor did know, plaintiff has not come forward with any evidence tending show that plaintiff's campaigning played any part in the decision to eliminate plaintiff's position.

The Court finds there is evidence in the record to support the plaintiff's claim. Aside from plaintiff's own assertion, there is evidence in the record from which a reasonable jury could conclude that the Mayor knew plaintiff was campaigning against him prior to the termination of plaintiff's employment. The Court also finds the temporal proximity in this case – 60 hours from the end of the

14

election to the time plaintiff was informed his position was being eliminated – "is sufficient, by itself, to create an inference of causation." Hudson v. Norris, 227 F.3d 1047, 1051 (8th Cir. 2000). See also Bassett v. City of Minneapolis, 211 F.3d 1097, 1105 (8th Cir. 2000); O'Bryan v. KTIV Television, 64 F.3d 1188, 1193 (8th Cir. 1995). Viewing the evidence in a light most favorable to plaintiff, the Court finds plaintiff can establish a prima facie case of First Amendment retaliation.

The City also argues there was a legitimate, lawful reason for the elimination of plaintiff's position – cost savings – and that plaintiff's position would have been eliminated in any event. The City further argues that plaintiff cannot present evidence of pretext to rebut its proffered reason.

Plaintiff's burden of establishing pretext "is more difficult for a plaintiff than at the prima facie stage because, [. . .] evidence of pretext and discrimination are viewed in the light of the employer's justification." Morris v. City of Chillicothe, 512 F.3d 1013, 1019 (8th Cir. 2008). Temporal proximity, while relevant, "is not enough to support a finding of pretext." Id. "Pretext may be shown with evidence that an employer has proffered an explanation with no basis in fact, with evidence that the plaintiff[ ] recently received favorable reviews, or with evidence that the employer's proffered reason for its employment decision has changed substantially over time." Id. (citing to Smith v. Allen Health Systems, Inc., 302 F.3d 827, 834 (8th Cir. 2002)).

Here, plaintiff argues that the City's proffered reason for his termination – cost savings – is pretextual because there is evidence that: (1) there was no action to terminate his employment until immediately after the election; (2) there were no written disciplinary actions in plaintiff's personnel file, and the evidence supports the fact that plaintiff was an exemplary worker; (3) no other cost-savings measures were considered or taken at the time; (4) after plaintiff's termination all City employees received a raise; and (5) plaintiff had worked for the City for 19 years and there were other employees with less seniority who could have been terminated. Considering all these factors

and the timing of plaintiff's termination, the Court finds plaintiff has come forward with sufficient evidence of pretext to rebut the City's proffered reason for the termination of his employment.

The Court concludes, based on the record before it and resolving all conflicts in favor of plaintiff, that there are genuine issues of material fact as to whether plaintiff's employment was terminated as a result of his campaigning activities against the Mayor.  As a result, defendants have not shown that they are entitled to judgment as a matter of law as to Count III.

### *VI. Conclusion*

In sum, the Court finds defendant Lawrence Besmer is entitled to legislative immunity as to the one claim against him, Count III.  The City is entitled to sovereign immunity as to the claims against it in Counts I and II, state law claims of whistle- blowing and wrongful discharge in violation of public policy and the Court does not reach the merits of these claims.  The City is not entitled to summary judgment as to Count III, plaintiff's claim of First Amendment retaliation brought pursuant to §1983, because there remain issues of disputed facts to be determined by a jury.  However, plaintiff may not recover punitive damages against the City under Count III.

Accordingly,

**IT IS HEREBY ORDERED** that defendant Lawrence Besmer's second motion for summary judgment is **GRANTED.** [Doc. 58]   Defendant Besmer is entitled to legislative immunity.

**IT IS FURTHER ORDERED** that defendant City of Woodson Terrace's second motion for partial summary judgment is **GRANTED.** [Doc. 61]  Defendant City of Woodson Terrace is entitled to sovereign immunity as to Counts I and II, and plaintiff cannot recover punitive damages against the municipality under remaining Count III.

**IT IS FURTHER ORDERED** that defendants' first motion for summary judgment is **DENIED** as follows:  The motion is **DENIED as moot** as to Counts I and II against defendant City

16

of Woodson Terrace, and as to Count III against defendant Lawrence Besmer; the motion is **DENIED** as to Count III against the City.

An appropriate partial judgment will accompany this Memorandum and Order.

                                                                                                                                                                                                                                                         

                                                        **CHARLES A. SHAW**
                                                        **UNITED STATES DISTRICT JUDGE**

Dated this   14th   day of May, 2013